# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39747**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Sean M. MILLER**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 3 March 2021

————————————

*Military Judge:* John C. Harwood (arraignment, motions); Willie J. Babor.

*Approved sentence:* Dismissal and confinement for 18 months. Sentence adjudged 4 December 2018 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Yolanda D. Miller, USAF; Robert Feldmeier, Esquire.

*For Appellee:* Major Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, LEWIS, and CADOTTE, *Appellate Military Judges*.

Chief Judge J. JOHNSON delivered the opinion of the court, in which Senior Judge LEWIS and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of five specifications of attempted sexual abuse

of a child in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880, and two specifications of wrongfully soliciting production and distribution of child pornography in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1,2] The military judge sentenced Appellant to a dismissal and to be confined for 18 months. The convening authority approved the adjudged sentence.

Appellant raises seven issues on appeal: (1) whether the evidence is factually and legally insufficient to support his convictions; (2) whether Specifications 2 and 3 of Charge I alleging attempted sexual abuse of a child fail to state an offense; (3) whether Specifications 1 and 3 of Charge I alleging attempted sexual abuse of a child are multiplicious or unreasonably multiplied; (4) whether the record of trial is incomplete; (5) whether Appellant has been subjected to unlawful post-trial punishment due to restrictions on his Internet access during his parole; (6) whether Appellant's sentence is disparate and unreasonably severe; and (7) whether Appellant is entitled to relief due to unreasonable post-trial delay.[3] We have carefully considered issue (5) and find that it does not warrant further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). With regard to the remaining issues, we find no error that has materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In early November 2016, Appellant—a married, 28-year-old first lieutenant (O-2)[4] stationed in Germany—was in Florida for pre-deployment training when he noticed an online personal advertisement entitled "Military Dependent lookin 4 attention – w4m (Hurlburt Field)."[5] The body of the advertisement read: "Just got to hurlburt and i am lonely. Not interested in anything serious lookin to have sum fun. If you cannot get on base don't bother. if you can…

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The military judge excepted certain allegedly indecent words from one specification of attempted sexual abuse of a child and found Appellant not guilty with respect to those words.

[3] Appellant raises eight assignments of error, but for purposes of analysis we have consolidated Appellant's first two assignments of error into issue (1). In addition, we have slightly reordered the issues Appellant raises. Appellant personally raises issues (5) and (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Appellant was promoted to captain (O-3) effective December 2016.

[5] Unless otherwise marked, Internet postings, texts, and other communications quoted in the opinion are presented verbatim without corrections.

HMU…….Please put 'base' in the title so I know your real and send me a pic…
:)."

On the evening of 4 November 2016, Appellant responded, "Hi. A fun time sounds good" and attached an image of his head and shoulders. Less than two hours later, Appellant followed up with a message reading, "Im sorry you are lonly. I would love to help out." Seven minutes later, Appellant received a response from "Tiffany": "Hellooo, I luv your pic;)  I am a wf, 5'5 115 and very friendly.. I will be 15 in a few months and just got here a few months ago from MD. I tried this before and had alot of fun." The following exchange of messages between Appellant and "Tiffany" ensued:

[Appellant:]   Thank you[.] You are about to be 15?

["Tiffany":]    in 3 months

[Appellant:]   Happy early birthday[.] I unfortanly will not be able to meet you. I am a little older than you. But we can talk

["Tiffany":]    I don't need a friend.. please don't take that the wrong way

[Appellant:]   What do you need

["Tiffany":]    what r u interested in;)—

[Appellant:]   A lot of things. But Im 28

["Tiffany":]    that is ok with me? What do you like to do [smiling emoji]

[Appellant:]   It might be ok with you. But the law says otherwise. I dont want to get in trouble. You seem like a geeat young lady

["Tiffany":]    I don't want to get into any trouble either.  Just lookin for a good time

[Appellant:]   What are you looking for[?] And you wouldnt be the one in trouble

["Tiffany":]    I am up 4 anything, what did you have in mind.  If my mom found out I was on this she would kill me… I am just tired of boyz and lookin for someone mature.

[Appellant:]   Im looking for some affection and trying new things. But im only here a short time. High school boys are the worst. I understand your wants fir someone more mature

["Tiffany":]    what kind of affection;)

["Tiffany":]    High school boyz r the wurst

[Appellant:]    Oral. 69. Doggy. Anal[.]

Appellant continued to exchange messages with "Tiffany" during the evening of 4 November 2016, inquiring about her sexual experiences, preferences, and desires, and offering sexual advice. Eventually, "Tiffany" asked if Appellant was "down 2 meet this week." Appellant responded, "Maybe. Im still concerned about the [a]ge. It would have to be tomorrow or sunday morning." Shortly thereafter, "Tiffany" told Appellant "Just leave me alone if your not serius." Appellant did not respond to this message.

In reality, the advertisement had been created by Special Agent (SA) SW, a member of the Air Force Office of Special Investigations (AFOSI). SA SW created the "Tiffany" persona as part of an AFOSI operation. On 7 November 2016, approximately two-and-a-half days after "Tiffany's" last message to Appellant, SA SW sent Appellant another message asking "r u still on?" Appellant responded a minute later, asking "Whats up[?]" By this time Appellant was in South Carolina on his way back to Germany. He told "Tiffany" he would have "loved to" meet with her and perform oral sex. When "Tiffany" asked if they could continue communicating, Appellant agreed. "Tiffany" and Appellant moved their conversations to email and instant messages, and continued to communicate until late January 2017. The subject matter was largely sexual; Appellant asked "Tiffany" sexually oriented questions about herself and shared his explicit sexual fantasies and desires. Appellant sent "Tiffany" several additional images of himself, including images of himself holding his penis through his clothing. Appellant requested "Tiffany" send him sexually explicit pictures of herself, including images of her genitals and of herself masturbating. "Tiffany" sent Appellant two non-explicit photos of someone she purported to be herself[6] but did not send any sexually explicit images.

After Appellant told SA SW he was stationed in Germany, SA SW contacted SA CW, an AFOSI agent stationed at Ramstein Air Base (AB), Germany, to explore the possibility of continuing communications with Appellant through another fictional persona. As a result, SA SW as "Tiffany" informed Appellant that "she" had a friend, "Kerri," who had moved to Germany and was "freaky" like "Tiffany." After "Tiffany" purported to communicate with "Kerri" about Appellant, "Tiffany" provided Appellant "Kerri's" email address. "Kerri" was a fictional persona of a 14-year-old female dependent living on Ramstein AB, Germany, created by SA CW.

Appellant initiated communications with "Kerri" by sending her an email on 29 November 2016, to which "Kerri" responded the same day. Appellant's

---

[6] The images SA SW sent Appellant were photos of a female AFOSI agent that had been digitally modified to make her appear younger.

communications with "Kerri" continued until February 2017 and were of the same general nature as his communications with "Tiffany," although more extensive, including numerous explicit descriptions of Appellant's sexual desires, fantasies, and experiences, and requests for sexual information about "Kerri." Appellant sent "Kerri" images of himself, including images of himself holding his penis through clothing and videos of his exposed penis. As with "Tiffany," Appellant requested "Kerri" send him sexually explicit images of herself. Similar to "Tiffany," SA CW as "Kerri" sent Appellant only non-explicit images of SA CW herself that had been digitally modified to make her appear younger. Although Appellant shared fantasies about engaging in sexual acts with "Kerri," and with "Tiffany" and "Kerri" together, he did not attempt to meet with "Kerri" in person.

Appellant deployed from Germany to southwest Asia in early January 2017. In mid-February 2017, SA CW traveled to Appellant's deployed location to apprehend him. Appellant's apprehension terminated his communications with "Tiffany" and "Kerri."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable

doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to find Appellant guilty of an attempt in violation of Article 80, UCMJ, the military judge was required to find the following beyond a reasonable doubt: (1) that Appellant did a certain overt act; (2) that the act was done with the specific intent to commit a certain offense under the UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.b. Sexual abuse of a child in violation of Article 120b, UCMJ, 10 U.S.C. § 920b, required the commission of a "lewd act" on a child under the age of 16 years. In this context, a "lewd act" included, *inter alia*, (1) "intentionally exposing one's genitalia . . . including via any communication technology, with an intent . . . to arouse or gratify the sexual desire of any person;" (2) "intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person;" or (3) "any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology," amounting "to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave the morals with respect to sexual relations." *MCM*, pt. IV, ¶ 45b.a.(h)(5)(B)–(D). "'Indecent' language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts." *MCM*, pt. IV, ¶ 89.c.

Appellant's convictions for solicitation in violation of Article 134, UCMJ, as charged here, required the military judge to find the following elements beyond a reasonable doubt: (1) that Appellant solicited another to commit a certain offense under the code; (2) that Appellant did so with the intent that the offense actually be committed; and (3) that, under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 105.b. The elements for production and distribution of child pornography in violation of Article 134, UCMJ, include: (1) knowing and wrongful production and distribution of child pornography to another; and (2) that, under the circumstances, the conduct was prejudicial to good order and discipline in the armed forces or of a nature to bring discredit on the armed forces. *See MCM*,

pt. IV, ¶ 68b.b.(3), (4). "Child pornography" is defined as "material that contains either an obscene visual depiction of a minor engaging in sexually explicit conduct or a visual depiction of an actual minor engaging in sexually explicit conduct." *MCM*, pt. IV, ¶ 68b.c.(1). "Sexually explicit conduct" includes, *inter alia*, "actual or simulated . . . masturbation . . . [and] lascivious exhibition of the genitals or pubic area of any person." *MCM*, pt. IV, ¶ 68b.c.(7).

### 2. Analysis

First we consider the legal and factual sufficiency of the evidence generally; then we consider each of Appellant's specific arguments with respect to the sufficiency of the evidence.

### a. Legal and Factual Sufficiency Generally

The Government introduced convincing evidence with respect to each specification for which Appellant was convicted: Specifications 1 through 5 of Charge I, alleging attempted sexual abuse of a child, and Specifications 1 and 2 of Charge II, alleging solicitation to produce and distribute child pornography. The Government introduced the testimony of SA SW and SA CW regarding their communications with Appellant, as well as the messages and images Appellant exchanged with "Tiffany" and "Kerri." The Government also introduced testimony from three other witnesses who provided circumstantial photographic, medical, and travel record evidence tending to confirm Appellant's identity as the individual communicating with "Tiffany" and "Kerri."

Charge I, Specification 1 alleged Appellant attempted to commit a lewd act upon "Kerri," whom he believed to be a child under 16 years old, by intentionally exposing his penis to her via communication technology with the intent to gratify his sexual desires. Appellant sent "Kerri" videos via instant message that evidently depicted Appellant's hand on his exposed penis. From the context, a reasonable factfinder could conclude Appellant intentionally exposed his penis to "Kerri" via communication technology with the intent to gratify his sexual desires.

Charge I, Specifications 2 and 3 alleged Appellant attempted to commit lewd acts upon "Tiffany" and "Kerri," respectively, on divers occasions by engaging in indecent conduct, specifically "holding and displaying" his penis through clothing, intentionally done in the presence of "Tiffany" and "Kerri" via communication technology. Appellant sent multiple images to "Tiffany" and "Kerri" that evidently depicted himself holding his penis through clothing; although his penis is not exposed, its shape is discernible through the clothing. A reasonable factfinder could conclude Appellant's conduct was indecent in that it "amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tend[ed] to

excite sexual desire or deprave the morals with respect to sexual relations." *See MCM*, pt. IV, ¶ 45b.a.(h)(5).

Charge I, Specifications 4 and 5 alleged Appellant attempted to commit lewd acts upon "Tiffany" and "Kerri," respectively, on divers occasions by communicating indecent language via communication technology. Each specification recites the allegedly indecent language verbatim. As described above, Appellant's messages to "Tiffany" and "Kerri" involve graphic descriptions of Appellant's sexual desires and fantasies, as well as requests for sexual information about "Tiffany" and "Kerri" and requests and encouragement that they engage in certain sexual behavior. A reasonable factfinder could conclude that, under the circumstances, Appellant's messages were "grossly offensive to modesty, decency, or propriety, or shock[ed] the moral sense, because of [their] vulgar, filthy, or disgusting nature, or [their] tendency to incite lustful thought." *See MCM*, pt. IV, ¶ 89.c.

With regard to each of the specifications of Charge I, a reasonable factfinder could conclude Appellant committed certain overt acts, beyond mere preparation, with the specific intent to commit the offense of sexual abuse of a child in violation of Article 120b, UCMJ, and which apparently tended to effect the commission of the offense.

Charge II, Specifications 1 and 2 alleged Appellant, on divers occasions, wrongfully solicited "Tiffany" and "Kerri" to produce and distribute child pornography, specifically visual depictions of themselves engaging in sexually explicit conduct, and Appellant's conduct was of a nature to bring discredit on the armed forces. Through his messages, on more than one occasion Appellant stated he wanted "Tiffany" to send him images of herself displaying her genitals and masturbating, among other sexually oriented activities. Similarly, Appellant told "Kerri" that he wanted to receive pictures or videos of her masturbating, and thereafter continued to encourage her to send him pictures. A reasonable factfinder could conclude Appellant solicited "Tiffany" and "Kerri" to produce child pornography and to distribute it to him, and that his actions were of a nature to discredit the Air Force.

On appeal, Appellant does not challenge the evidence that he sent the indecent messages and images to "Tiffany" and "Kerri," nor does he suggest that he doubted that "Tiffany" and "Kerri" were in fact 14-year-old girls, nor does he contest the indecent nature of the charged communications and images. Instead, he makes three other arguments: that he was entrapped; that, with respect to Specification 1 of Charge I, the Government was required to prove he exposed his penis to "Kerri" in real time; and that Specifications 1 and 2 of Charge II are legally insufficient because the person solicited was not a child.

### b. Entrapment

Rule for Courts-Martial (R.C.M.) 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." In the usual case, applying what has been called the "subjective" test for entrapment, the defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992).[7] Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense. . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.* (citations omitted). "Inducement" means more than merely providing the means or opportunity to commit a crime; the Government's conduct must "create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Howell*, 36 M.J. 354, 359–60 (C.M.A. 1993) (citations and internal quotation marks omitted).

Appellant contends the Government failed to overcome evidence that he was entrapped. At trial, the Defense introduced evidence from several witnesses relevant to the entrapment defense. The Defense called an expert in digital forensics to testify that he searched Appellant's email account and found no information related to child pornography nor any indication Appellant had ever communicated with actual minors, although there were many sexually themed communications with adult women. The Defense presented evidence from a current and a former supervisor attesting to Appellant's good military character. In addition, the Defense called a forensic psychologist who had evaluated Appellant and who described, *inter alia*, Appellant's diagnosis of depression and described him as "quite emotionally needy," "starved for affection and intimacy and contact," and "seeking attention and affirmation."

Although Appellant's indecent language to "Tiffany" began within minutes of learning she was 14 years old, two aspects of SA SW's communications with

---

[7] In addition to the "subjective" test for entrapment, military appellate courts have recognized an "objective" test whereby a court may find the Government's conduct so outrageous or shocking to the judicial conscience that it violates an accused's right to due process under the Fifth Amendment, U.S. CONST. amend. V, and thereby constitutes entrapment as a matter of law. *United States v. Berkhimer*, 72 M.J. 676, 680 (A.F. Ct. Crim. App. 2013); *see also United States v. Lemaster*, 40 M.J. 178, 180–81 (C.M.A. 1994); *United States v. Vanzandt*, 14 M.J. 332, 343 n.11 (C.M.A. 1982). Appellant does not contend, and we do not find, the facts of the instant case implicate "objective" entrapment.

Appellant lead us to assume *arguendo* the evidence raised the issue of entrapment with respect to some of the charged offenses. First, Appellant ceased communicating with "Tiffany" after she told him to "just leave [her] alone" if he was not serious and did not resume communicating until SA SW reengaged with him over two-and-a-half days later. Second, at one point after Appellant sent pictures of himself holding his clothed penis, SA SW as "Tiffany" encouraged Appellant to send more images, although "Tiffany" did not specifically request images of his penis. These aspects, in combination with the absence of any evidence that Appellant pursued or engaged in other sexual activity with children or child pornography, arguably constitute "more than a scintilla" of evidence that the Government induced his behavior to some extent, and that he lacked a predisposition to engage in the charged offenses. *See Howell*, 36 M.J. at 359.[8] Accordingly, for purposes of our analysis, we assume without deciding the defense of entrapment was raised.

However, we further conclude the evidence demonstrates beyond a reasonable doubt Appellant was not entrapped. An accused who commits an offense without an extraordinary inducement from a Government agent to do so demonstrates a predisposition to commit the offense and is not the victim of entrapment. *Whittle*, 34 M.J. at 208 (citations omitted). "Extraordinary inducement" requires more than simply being presented with the opportunity to commit the crime. *Id*. In this case, Appellant chose to continue corresponding with "Tiffany" even after he learned she was only 14 years old. Appellant initiated the sexually explicit conversations and initially sent "Tiffany" sexually charged images of himself holding his clothed penis without being asked for such images. Thus, Appellant had already demonstrated his predisposition before "Tiffany" briefly encouraged him to send more images, without specifying that they be sexual in nature. Similarly, the fact that Appellant initiated contact with "Kerri," believing her to be another 14-year-old girl, in order to engage in sexually explicit communications to gratify his sexual desires further illustrates his predisposition. The fact that Appellant may have been depressed or craved affirmation, although arguably mitigating or extenuating, did not nullify his predisposition or otherwise excuse his behavior. In short, the Government's conduct did not create a substantial risk that an undisposed person or otherwise law-abiding citizen would commit these crimes. *See Howell*, 36 M.J. at 359.

---

[8] The parties and military judge were evidently attuned to the defense of entrapment, which was mentioned during the Defense's opening statement, during presentation of evidence, and during both parties' closing arguments.

### c. Exposure

Appellant contends his conviction of Specification 1 of Charge I, attempted sexual abuse of a child by intentionally exposing his penis to "Kerri" via communication technology, is legally insufficient because "exposure has a temporal element and must be simultaneous with the uncovering and display of genitalia." Appellant relies on *United States v. Williams*, 75 M.J. 663, 666–69 (A. Ct. Crim. App. 2016), wherein our sister court considered the meaning of the word "expose" in the context of the common law offense of indecent exposure. The court explained that the common law "required the exposure to occur in the actual presence of the victim or the public," and "exposure committed through digital technology outside the presence of a victim does not constitute the offense of indecent exposure." *Id*. at 667 (citation omitted). Moreover, the court found the 2006 Manual for Courts-Martial version of Article 120(n), UCMJ, 10 U.S.C. § 920(n), and 2012 Manual for Courts-Martial version of Article 120c(c), 10 U.S.C. § 920c(c), retained this common law requirement. *Id*. at 667–69. However, as Appellant acknowledges, *Williams* specifically distinguished the offense of sexual abuse of a child in violation under Article 120b(c), which explicitly includes "intentionally exposing one's genitalia . . . to a child *by any means, including via any communication technology*, with an intent to . . . arouse or gratify the sexual desire of any person," in the definition of a lewd act. *Id*. at 668 (quoting 10 U.S.C. § 920b(h)(5)(B) (2012)). Nevertheless, although Appellant concedes that indecent exposure to a child in violation of Article 120b(c) may occur remotely, he argues Article 120b did not eliminate the *temporal* requirement under the common law. In other words, Appellant argues that Specification 1 of Charge I is legally insufficient because the exposure did not occur "live," in real time.

We are not persuaded. As the Government notes, this court has repeatedly upheld convictions for actual and attempted sexual abuse of a child in similar situations, in which the appellant sent images of his genitalia to a purported child via email or instant message rather than a live transmission. *See, e.g.*, *United States v. Dowd*, No. ACM 39073, 2017 CCA LEXIS 738, at *3 (A.F. Ct. Crim. App. 29 Nov. 2017) (unpub. op.); *United States v. Thomas*, No. ACM 38977, 2017 CCA LEXIS 391, at *9–10 (A.F. Ct. Crim. App. 6 Jun. 2017) (unpub. op.); *United States v. Estimon*, No. ACM 38598, 2015 CCA LEXIS 364, at *2–3, 8 (A.F. Ct. Crim. App. 1 Sep. 2015) (unpub. op.). These decisions are hardly in conflict with *Williams*, which pointedly distinguished offenses against minors. Moreover, our Navy and Marine Corps counterparts found "no basis in law or fact" to question a guilty plea to attempted sexual abuse of a child by committing a lewd act, where the appellant transmitted a nude picture of himself by text message to someone he thought was a 15-year-old girl. *United States v. Uriostegui*, 75 M.J. 857, 859, 866 (N.M. Ct. Crim. App. 2016) (citing *Estimon*, unpub. op. at *3, with approval).

Examining the language of Article 120b(c), we find no cause to question these prior decisions. Congress specified an expansive definition of "exposure" for purposes of sexual abuse of a child: "by *any* means, including via *any* communication technology . . . ." 10 U.S.C. § 920b(h)(5)(B) (emphasis added). As the court explained in *Williams*, "Congress has indicated a strong societal interest in protecting children from pornographic images thrust upon them by predatory adults via the internet. Thus, Congress expanded the definition of exposure as it relates to children—eliminating the requirement for the actual display of live genitalia." 75 M.J. at 668. In light of the ubiquity of email and messaging platforms that enable transmission of prerecorded images and videos, coupled with the expansive language Congress enacted in Article 120b, UCMJ, we discern no such live temporal requirement as Appellant proposes, and no legal insufficiency in his conviction for Specification 1 of Charge I.

### d. Soliciting a Fictional Child

Appellant contends his convictions of Specifications 1 and 2 of Charge II, soliciting "Tiffany" and "Kerri" to produce and distribute child pornography, are legally insufficient for three reasons. First, he asserts "the images he requested were not child pornography," because the people he actually solicited were adult AFOSI agents and not actual children. Second, he asserts he cannot be guilty because he believed he was soliciting civilians who were not subject to the UCMJ, and who therefore could not commit an offense "under the code." *See MCM*, pt. IV, ¶ 105.b. Third, Appellant asserts the Government was required to prove the solicitees knew the requested act was part of a criminal venture, which the Government did not and could not prove because "Tiffany" and "Kerri" did not exist. *See United States v. Higgins*, 40 M.J. 67, 68 (C.M.A. 1994).

Appellant cannot prevail with these arguments in light of *United States v. Knarr*, 80 M.J. 522 (A.F. Ct. Crim. App. 2020), *rev. den'd*, 80 M.J. 348 (C.A.A.F. 2020), which was decided after Appellant filed his assignments of error. *Knarr* involved circumstances essentially similar to the instant case. The appellant requested "Ella," someone he believed to be a 14-year-old girl, to send him naked images of herself, including her genitals; in reality, "Ella" was a fictional persona created by a law enforcement agent. *Id.* at 527–28. The appellant contended, *inter alia*, that he could not be guilty of soliciting the distribution of child pornography because "Ella" was not real, and therefore the solicited offense was impossible. *Id.* at 530. This court rejected that argument and held that, "provided the elements of the offense are otherwise satisfied, the impossibility of the crime solicited is not a defense to solicitation in violation of Article 134, UCMJ." *Id.* at 531.

Although slightly different in form, Appellant's arguments regarding solicitation are variations of the impossibility argument we addressed in *Knarr*.

Appellant's convictions are legally sufficient for the same reasons Knarr's were. "The 'general rule is that an accused should be treated in accordance with the facts as he or she supposed them to be,'" and Appellant's mistake regarding the identity of the person solicited "affords him no defense in military jurisprudence." *Id.* at 530 (quoting *United States v. Riddle*, 44 M.J. 282, 286 (C.A.A.F. 1996)); *id.* at 531 (citing *United States v. Dellacamera*, No. 201600230, 2017 CCA LEXIS 209, at *9 (N.M. Ct. Crim. App. 30 Mar. 2017) (unpub. op.)); *see id.* at 530 n. 6.

### e. Conclusion as to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt and find his convictions factually sufficient as well. *See Turner*, 25 M.J. at 325.

## B. Failure to State an Offense

### 1. Law

Ordinarily, we review de novo questions of statutory interpretation and whether a specification alleges an offense. *United States v. Schloff*, 74 M.J. 312, 313 (C.A.A.F. 2015) (citations omitted). "[W]here defects in a specification are raised for the first time on appeal, dismissal of the affected charges or specifications will depend on whether there is plain error -- which, in most cases, will turn on the question of prejudice." *United States v. Humphries*, 71 M.J. 209, 213 (C.A.A.F. 2012) (citations omitted). "In the context of a plain error analysis of defective indictments, '[the] [a]ppellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *Id.* at 214 (citing *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (additional citations omitted)).

"The military is a notice pleading jurisdiction." *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (citation omitted). "A charge and specification will be found sufficient if they, 'first, contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend, and, second, enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Id.* (alterations in original) (citation omitted). "A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication." R.C.M. 307(c)(3). If a specification is challenged for the first time on appeal, "the sufficiency of the specifica-

tion may be sustained 'if the necessary facts appear in any form or by fair construction can be found within the terms of the specification.'" *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F. 2006) (quoting *United States v. Mayo*, 12 M.J. 286, 288 (C.M.A. 1982)).

"'[C]ourts must give effect to the clear meaning of statutes as written' and questions of statutory interpretation should 'begin and end . . . with [statutory] text, giving each word its ordinary, contemporary, and common meaning.'" *United States v. Andrews*, 77 M.J. 393, 400 (C.A.A.F. 2018) (alterations in original) (quoting *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017)). "Unless the text of a statute is ambiguous, 'the plain language of a statute will control unless it leads to an absurd result.'" *United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2012) (quoting *United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012)) (additional citation omitted).

### 2. Analysis

On appeal, for the first time Appellant contends that Specifications 2 and 3 of Charge I fail to state an offense, and therefore must be set aside and dismissed. These specifications allege Appellant attempted to commit lewd acts on "Tiffany" and "Kerri," respectively:

> by engaging in indecent conduct, to wit: holding and displaying [his] penis through his clothing, intentionally done in the presence of [the "victim"] via communication technology, which conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.

Appellant notes that Article 120b(h)(5)(B), UCMJ, defines the term "lewd act" to include, *inter alia*, "intentionally exposing one's genitalia . . . to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person." Appellant invokes the principle of statutory construction *expressio unius est exclusio alterius*[9] to infer that Congress, by specifying the exposure of one's genitalia as a "lewd act" under Article 120b, UCMJ, intended that the display of clothed genitalia was not a "lewd act." Therefore, he reasons, the specifications alleging the display of clothed genitalia fail to state an offense.

We find Appellant's argument wholly unconvincing. We need not resort to principles of statutory construction where the plain language of the statute is unambiguous. It is evident the Government charged Appellant with attempted

---

[9] *See, e.g.*, *United States v. Murphy*, 74 M.J. 302, 309–10 (C.A.A.F. 2015) ("[T]he expression of one thing is the exclusion of another.")

commission of a lewd act by "any indecent conduct" under Article 120b(h)(5)(D), UCMJ, rather than by displaying his genitals under Article 120b(h)(5)(B), UCMJ. Subsection (D) provides the legal criteria for such indecent conduct, which the Government essentially quoted verbatim in each specification. We find no ambiguity that requires further interpretation of congressional intent. Furthermore, we find nothing absurd about Appellant's convictions for sending images focused on his clothed genitalia being held in his hand in a manner to display its form, to those he presumed to be children under the age of 16 years, in the context of continuing explicit descriptions of his sexual desires and fantasies. *See Schell*, 72 M.J. at 343 (citation omitted).

Moreover, assuming *arguendo* further statutory interpretation is warranted, we find Appellant's application of *expressio unius est exclusio alterius* inapt. Exposing specific body parts with an intent to abuse, humiliate, or degrade or to arouse sexual desire under subsection (B), and "any indecent conduct . . . that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety . . . ," etcetera, under subsection (D) are independent types of lewd acts proscribed by the statute, with distinct criteria. That Congress elected to proscribe specific displays of nudity under subsection (B) carries no implication that the display of clothed genitalia cannot be charged under subsection (D), if the accused's acts otherwise meet the criteria.

Accordingly, Appellant's assignment of error is without merit.

## C. Multiplicity and Unreasonable Multiplication of Charges

### 1. Additional Background

After arraignment and before trial, the Defense moved to dismiss Specifications 1, 2, and 3 of Charge I (Appellant's transmission of images of his clothed penis to "Tiffany" and his clothed and exposed penis to "Kerri") and Charge II and its two specifications (soliciting production and distribution of child pornography) as multiplicious or, in the alternative, unreasonably multiplied with Specifications 4 and 5 of Charge I (communicating indecent language to "Tiffany" and "Kerri"). The Government opposed the motion.

In a written ruling, the military judge granted the defense motion in part and denied it in part. The military judge applied the elements test established in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), and concluded each of the charged offenses required proof of separate elements, and therefore the specifications were not multiplicious. Furthermore, he applied the factors set forth in *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001), and concluded the specifications of Charge I were not unreasonably multiplied. However, he ruled that "the specifications of Charge II are unreasonably multiplied

in the context of sentencing," and that he would reduce the maximum imposable term of confinement accordingly.

**2. Law**

Multiplicity in violation of the Double Jeopardy Clause[10] occurs when "a court, contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct." *United States v. Anderson*, 68 M.J. 378, 385 (C.A.A.F. 2010) (quoting *United States v. Roderick*, 62 M.J. 425, 431 (C.A.A.F. 2006)) (emphasis and internal quotation marks omitted). We analyze Congress's intent by using the "separate elements" test the United States Supreme Court established in *Blockburger*, 284 U.S. at 304. *Roderick*, 62 M.J. at 432 (citation omitted). "[T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. We review claims of multiplicity de novo. *United States v. Forrester*, 76 M.J. 389, 394 (C.A.A.F. 2017) (citation omitted).

Even if charged offenses are not multiplicious, courts may apply the doctrine of unreasonable multiplication of charges to merge or dismiss certain charges and specifications. *Anderson*, 68 M.J. at 385–86 (quoting *Quiroz*, 55 M.J. at 338). R.C.M. 307(c)(4) summarizes this principle as follows: "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." We consider the following non-exhaustive factors in determining whether specifications are unreasonably multiplied:

> (1) Did the [appellant] object at trial that there was an unreasonable multiplication of charges and/or specifications?; (2) Is each charge and specification aimed at distinctly separate criminal acts?; (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?; (4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?; (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*Quiroz*, 55 M.J. at 338 (citation and internal quotation marks omitted). A military judge's denial of relief for claims of unreasonable multiplication of charges is reviewed for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citations omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were

---

[10] U.S. CONST. amend. V.

used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (citations omitted).

### 3. Analysis

On appeal, Appellant presents a narrower claim than he did at trial: he asserts that Specifications 1 and 3 of Charge I, alleging the exposure and clothed display of his penis to "Kerri," respectively, were multiplicious or, in the alternative, unreasonably multiplied with each other. We find no error by the military judge.

With regard to multiplicity, Specifications 1 and 3 of Charge I address distinct acts; Appellant sent "Kerri" two videos in which he exposed his penis, and separately sent multiple images of himself holding his clothed penis. Moreover, each specification requires proof of an element the other does not. Specification 1 required the Government to prove Appellant exposed his penis to "Kerri" with the intent to gratify his sexual desire. Specification 3 required the Government to prove Appellant held and displayed his penis "through his clothing . . . which conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." The military judge did not err by finding these specifications were not multiplicious.

With regard to unreasonable multiplication of charges, we review the military judge's ruling for an abuse of discretion in light of the *Quiroz* factors, recognizing that the ultimate standard is "reasonableness." *Quiroz*, 55 M.J. at 338. The first factor favors Appellant, who did object at trial. The second factor favors the Government, in that sending a purported child a video of Appellant's exposed penis was a distinct act from separately sending her other images of himself holding his clothed penis.

The third factor, whether having two separate specifications exaggerates Appellant's criminality, also favors the Government. Although the charged acts were similar in certain respects, each alleged offense was a legally distinct form of "lewd act" recognized by Article 120b, UCMJ, as discussed above in relation to Appellant's claim that Specifications 2 and 3 of Charge I failed to state an offense. Specification 1 alleged exposure of genitals under Article 120b(h)(5)(B), UCMJ; Specification 3 alleged indecent conduct under Article 120b(h)(5)(D), UCMJ, which could not have been charged under subsection (B).

Capturing these two distinct types of lewd act proscribed by Congress did not unreasonably exaggerate Appellant's criminality.

As for the fourth factor, we find it favors neither Appellant nor the Government. The charging of two specifications rather than one obviously increased Appellant's punitive exposure but not disproportionately so in light of the maximum confinement terms the other specifications carried. Ultimately, the effect of Appellant's conviction of both specifications rather than just one was to increase the maximum imposable term of confinement from 60 years to 75 years. Both figures were vastly beyond the Government's recommended term of four years.[11] Although 15 years of confinement is undeniably a significant potential prison term, its addition to the maximum imposable punishment did not dramatically affect the sentencing landscape.

Finally, we find no evidence of prosecutorial abuse or overreach in the charging of these two specifications. For example, we note the Government reasonably elected not to separately charge each individual video and image Appellant sent "Kerri" of his exposed and clothed penis.

Considering the factors together, in conjunction with the totality of the circumstances under the overarching standard of reasonableness, we find the military judge did not abuse his discretion by denying relief for unreasonable multiplication with respect to Specifications 1 and 3 of Charge I.

## D. Completeness of the Record

### 1. Additional Background

The action of the convening authority included in the record of trial, dated 19 March 2019, includes the following language: "the action taken by [the convening authority] on 7 March 2019, is withdrawn and the following is substituted for the original action: . . . ." However, the previous action dated 7 March 2019 was not included in the original record received by this court.

In response to Appellant's assignment of error, the Government moved this court to attach a sworn declaration from the convening authority's staff judge advocate (SJA) dated 2 December 2019, and a copy of the 7 March 2019 action. The SJA explained that after the convening authority signed the first action, the SJA's office discovered that Appellant had changed units, and that the unit reflected in the 7 March 2019 action was inaccurate. Therefore, according to the SJA, the "convening authority withdrew the original action and substituted a corrected action . . . ." The SJA's declaration concludes, "[i]n error, the 7

---

[11] At the time the military judge ruled, Appellant had not elected whether to be tried by members or the military judge alone.

March 2019 action was not included in the record of trial. The document included with this declaration is a copy of the rescinded action." There is no substantive difference between the actions taken on 7 March 2019 and 19 March 2019. Appellant did not oppose the Government's motion to attach, and this court granted it.

**2. Law**

Whether a record of trial is complete is a question of law we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

When a sentence includes a dismissal, Article 54(c)(1)(A), UCMJ, 10 U.S.C. § 854(c)(1)(A), requires the preparation of a complete record of the proceedings. A complete record of proceedings includes, *inter alia*, "[t]he original dated, signed action by the convening authority." R.C.M. 1103(b)(2)(D)(iv). Failure to comply with R.C.M. 1103(b)(2) "does not necessarily require reversal." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted). Rather, an incomplete record "raises a presumption of prejudice which the Government may rebut." *Id.*; *see also United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F. 2014) ("[I]n the case of most incomplete records prophylactic measures are not prescribed, and the missing material or remedy for [the] same are tested for prejudice . . . ."). "A substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the Government must rebut. . . . Insubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *Henry*, 53 M.J. at 111 (citations omitted).

R.C.M. 1107(f)(2) provides in pertinent part that the convening authority may "recall and modify any action at any time prior to forwarding the record for review, as long as the modification does not result in action less favorable to the accused than the earlier action."

**3. Analysis**

Appellant contends that the omission of the "original action" dated 7 March 2019 rendered the record incomplete, and therefore this court should return the record to the convening authority for a "corrected record." The Government responds with two arguments. First, the Government contends the corrected 19 March 2019 action included in the record of trial is sufficient to make the record substantially complete. Second, the Government argues that by granting its motion to attach a copy of the 7 March 2019 action, this court has made the record complete if it was not already so.

As an initial matter, we note that, on its face, the requirement in R.C.M. 1103(b)(2)(D)(iv) for the "original dated, signed action by the convening authority" is subject to two different interpretations. In context, "original" might

mean "first." This is the meaning Appellant attributes to it; the SJA's declaration uses the term "original" in a similar sense, and the Government does not contest this interpretation. However, an equally plausible interpretation is that the rule requires the "original" action in the sense of the physical document actually signed by the convening authority, as opposed to a copy. Under this interpretation, the presence of the second, corrected, signed, operative action might be sufficient for a complete record. Indeed, it would appear to make little sense for the rule to require the "original," withdrawn, erroneous action, but not the corrected, legally effective action.

Regardless, we find it unnecessary to definitively resolve the question. Even if we were to conclude R.C.M. 1103(b)(b)(2)(D)(iv) required the 7 March 2019 action to be in the record—which we do not decide—we find no remand is warranted. We conclude that we may consider the SJA's declaration and the 7 March 2019 action to resolve an issue raised in the record. *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020). The only difference between the two actions was that the prior action misidentified Appellant's unit of assignment. Accordingly, we conclude its absence from the record was an insubstantial omission. *See Henry*, 53 M.J. at 111. Furthermore, assuming *arguendo* the omission was substantial, we conclude it was harmless to Appellant's substantial rights beyond a reasonable doubt. *See Abrams*, 50 M.J. at 363.

### E. Sentence Severity

#### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

#### 2. Analysis

Appellant contends his sentence to confinement for 18 months is inappropriately severe. In support of his argument, he cites decisions of the United States Court of Appeals for the Armed Forces (CAAF) from 2013 and 2017 involving an Airman convicted of sexual assault and a Soldier convicted of rape,

respectively, each of whom received a six-month term of confinement.[12] Each case involved an adult victim. Appellant argues that in light of these results, his 18-month term of confinement for offenses that did not involve unlawful physical contact is "both disparate and unduly severe."

We are unpersuaded. We acknowledge that we may compare an appellant's case to other non-"closely related" cases in order to assess the propriety of the sentence, although we are not required to do so.[13] *See United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001); *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). However, unless the cases are closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). We find no reason to engage in such a comparison here; the cases Appellant cites are not only entirely unrelated, but highly dissimilar to his own.

Appellant sent sexually explicit communications and indecent images to someone he believed to be a 14-year-old child. When provided the opportunity, he initiated similar communications with a second individual he believed to be 14 years old. Appellant solicited both "girls" to create and send him images constituting child pornography. Appellant faced a maximum term of confinement for 75 years in addition to dismissal and total forfeiture of pay and allowances. The military judge determined 18 months of confinement and dismissal was an appropriate sentence. Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we conclude Appellant's sentence is not inappropriately severe.

**F. Post-Trial Delay**

**1. Additional Background**

Appellant's court-martial concluded on 4 December 2018. The convening authority initially took action on 7 March 2019, which he withdrew and substituted with a corrected action on 19 March 2019. However, the record of trial was not docketed with this court until 12 August 2019. This court is issuing its opinion 18 months and 19 days after docketing.

---

[12] *United States v. Davis*, 76 M.J. 224, 226 (C.A.A.F. 2017); *United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013).

[13] Cases are "closely related" when, for example, they involve "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999).

In response to Appellant's claim for relief for unreasonable post-trial delay, the Government moved this court to attach a sworn declaration from Captain (Capt) RG, Chief of Military Justice at the wing legal office at Ramstein AB, Germany, where Appellant was tried. Capt RG explained that on 2 April 2019, the convening authority's legal office (3 AF/JA) placed the original record of trial in the mail for delivery to the Air Force Legal Operations Agency Military Justice Division (JAJM) located at Joint Base Andrews, Maryland. On 8 May 2019, JAJM informed 3 AF/JA that the original record had failed to arrive and had evidently been lost in the mail. JAJM advised 3 AF/JA that the wing legal office's copy of the record would need to be copied and authenticated by the military judges. This process was slowed by the fact that one of the military judges was deployed at the time. The replacement original record of trial was placed in the mail on 26 July 2019 and received by JAJM and docketed with this court on 12 August 2019.[14]

### 2. Law

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay where the record of trial is not docketed with the Court of Criminal Appeals (CCA) within 30 days of the convening authority's action, and where the CCA does not issue its decision within 18 months of docketing. Where there is such a facially unreasonable delay, we consider the four factors identified in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)).

However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three interests protected by an appellant's due process right to timely post-trial review: (1) preventing oppressive incarceration; (2) minimizing anxiety and concern; and (3) avoiding impairment of the appellant's

---

[14] Appellant has not objected to our consideration of Capt RG's declaration, and we conclude that we may consider it to resolve an issue raised by the record of trial. *See Jessie*, 79 M.J. at 442.

grounds for appeal and ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

### 3. Analysis

The 146 days that elapsed between action and docketing greatly exceeded the 30-day threshold for a facially unreasonable post-trial delay the CAAF established in *Moreno*, 63 M.J. at 142. Similarly, the delay between docketing at this court and the issuance of this opinion exceeds Moreno's 18-month threshold for a facially unreasonable appellate delay. *Id.* However, Appellant has not claimed prejudice from either delay, and in light of *Moreno* we find none. Where the appellant does not prevail on the substantive grounds of his appeal, as in this case, there is no oppressive incarceration. *Id.* at 139. We discern no impairment to Appellant's grounds for appeal, and where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has made no such showing of particularized anxiety, and we perceive none.

Accordingly, the question becomes whether the delays in this case were so egregious as to adversely affect the public's perception of the military justice system. *Toohey*, 63 M.J. at 362. We conclude they were not. The facially unreasonable appellate delay was relatively slight—less than one month. The pre-docketing delay was primarily attributable to the unanticipated loss of the original record in the mail, compounded by delays in reaching a deployed military judge. To be sure, these delays are not attributable to Appellant, and reconstruction of the original record might have been accomplished with greater efficiency. However, we do not find these delays to be so egregious as to reflect adversely on the fairness of the military justice system in the absence of any cognizable prejudice to Appellant.

Finally, recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

### III. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court